**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**R.N. and A.N., Individually and on behalf of R.N.,**

                         **Plaintiffs,**

**v.**

                                                            **14-CV-211(LJV)**

**THE BOARD OF EDUCATION FOR THE IROQUOIS**
**CENTRAL SCHOOL DISTRICT,**

                         **Defendant.**

                    <ins>**REPORT, RECOMMENDATION, AND ORDER**</ins>

        Plaintiff R.N. and A.N. ("Parents") commenced this action seeking

reimbursement for tuition paid to the Gow School for their learning disabled son, R.N.,

between February 1, 2013, and June 30, 2013.  Dkt. #1.  Plaintiffs contend that the

defendant school district ("District") failed to provide R.N. with a Free Appropriate Public

Education ("FAPE") as required by the Individuals with Disabilities Act ("IDEA"), 20

U.S.C. §§ 1400 *et seq.*  Dkt. #1.


        This case was referred to the undersigned by the Hon. Richard J. Arcara,

pursuant to 28 U.S.C. § 636(b)(1)(A), for all pretrial matters and to hear and report on

dispositive motions.  Dkt. #13.  The case was reassigned to the Hon. Lawrence J.

Vilardo on December 4, 2015.  Dkt. #33.  Currently before this Court are defendant's

Motion for Summary Judgment (Dkt. #20) and plaintiffs' Cross-Motion for Summary

Judgment (Dkt. #29).  For the following reasons, it is RECOMMENDED that defendant's

motion for summary judgment be DENIED and plaintiffs' cross motion for summary

judgment be GRANTED.

## THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

"To receive federal funding under the IDEA, states are required to provide disabled children with a 'free appropriate public education.'"  *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (quoting 20 U.S.C. § 1412(a)(1)(A)).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child." *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d)); see also *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,* 465 F.3d 503, 507-08 (2d Cir. 2006) (internal quotation marks omitted), *amended on denial of rehearing by D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 480 F.3d 138, 140 (2d Cir. 2007).

To be adequate under the IDEA, a child's IEP must be "tailored to meet the unique needs of [that] particular child," *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012), and "afford[ ] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (citing *T.P.*, 554 F.3d at 254, and *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005)).  Overall, an IEP must be likely to produce progress, rather than regression.  *Id.*  It need not, however, "furnish every special service necessary to maximize each handicapped child's potential."  *Grim v. Rhinebeck*

*Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (internal quotations omitted).  Under

an IEP, "education [must] be provided in the 'least restrictive setting consistent with a

child's needs.'"  *Grim*, 346 F.3d at 379 (quoting *Walczak v. Florida Union Free Sch.*

*Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).


   An eligible child's IEP is created by local Committee on Special Education

("CSE"), composed of the student's parent or parents, a regular or special education

teacher, a school psychologist, a school district representative, an individual who can

interpret the instructional implications of evaluation results, a school physician, and a

parent of another student with a disability. *See* N.Y. EDUC. LAW § 4402(1)(b)(1)(a).  The

CSE members "must examine the student's level of achievement and specific needs

and determine an appropriate educational program."  *R.E.*, 694 F.3d at 175 (citing

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).


   If a parent believes that the local CSE has "fail[ed] to provide their

disabled child a FAPE, the parent may unilaterally place their child in a private school at

their own financial risk and seek tuition reimbursement."  *M.W. ex rel S.W. v. N.Y.C.*

*Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (internal citations omitted).  If the

parent cannot "front" the costs of private school tuition, he or she may "request direct

retroactive payment to the private school."  *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6

F. Supp. 3d 424, 427-29 (S.D.N.Y. 2014) (citing *Mr. & Mrs. A. ex rel. D.A. v. N.Y.C.*

*Dep't of Educ.*, 769 F. Supp. 2d 403, 427-29 (S.D.N.Y. 2011)).

A parent seeking tuition reimbursement must file a due process complaint to initiate a hearing before an Impartial Hearing Officer ("IHO") appointed by the local board of education. *See M.W. ex rel S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013); 20 U.S.C. § 1415(f); N.Y. EDUC. LAW § 4404(1). At the hearing, "the school district has the burden of demonstrating the appropriateness of the proposed IEP." *Grim*, 346 F.3d at 379. Should the school district fail to show that the IEP was adequate to afford the child an appropriate public education, the parents will be awarded tuition reimbursement if they meet their burden to show that the child's private school placement was appropriate and that the equities favor reimbursement. *See M.W.*, 725 F.3d at 135 (citations omitted). "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education." *M.H.*, 685 F.3d at 225 (citing *Grim*, 346 F.3d at 379-80); N.Y. EDUC. LAW § 4404(2). Any "party aggrieved" by the SRO's final administrative decision may seek review of it by bringing a civil action in state or federal court. *See M.W.*, 725 F.3d at 135-36; 20 U.S.C. § 1415(i)(2)(A).

## **MOTION FOR SUMMARY JUDGMENT IN AN IDEA CASE**

A federal court reviewing an SRO's decision must examine the entire administrative record and must hear additional evidence if either party requests it. *See* 20 U.S.C. § 1415(i)(2)(C). Procedurally, "[t]he court typically considers the propriety of the IEP on the parties' cross motions for summary judgment." *M.H.*, 685 F.3d at 225.

As the Second Circuit Court of Appeals noted in *Lillbask ex rel. Mauclaire v. State of*

*Conn. Dep't of Educ.*:

> a motion for summary judgment in an IDEA case often triggers more than
> an inquiry into possible disputed issues of fact. Rather, the motion serves
> as a pragmatic procedural mechanism for reviewing a state's compliance
> with the procedures set forth in [the] IDEA [in developing the specific IEP
> at issue] and determining whether the challenged IEP is reasonably
> calculated to enable the child to receive educational benefits.

397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).  "Though the

parties in an IDEA action may call the procedure 'a motion for summary judgment,' the

procedure is in substance an appeal from an administrative determination, not a

summary judgment [motion]."  *M.H.*, 685 F.3d at 226.

The role of the federal courts in reviewing state educational decisions

under the IDEA is "circumscribed."  *Gagliardo*, 489 F.3d at 112; *see also Grim*, 346 F.3d

at 380-81 (interpreting the IDEA as "strictly limiting judicial review of state administrative

decisions").   A reviewing court "must engage in an independent review of the

administrative record and make a determination based on a 'preponderance of the

evidence.'"  *Gagliardo*, 489 F.3d at 112.  That said, judicial review "is by no means an

invitation to the courts to substitute their own notions of sound educational policy for

those of the school authorities which they review."  *Gagliardo*, 489 F.3d at 113-114

(internal quotations omitted).   "To the contrary, federal courts reviewing administrative

decisions must give due weight to these proceedings, mindful that the judiciary

generally lacks the specialized knowledge and experience necessary to resolve

persistent and difficult questions of educational policy."  *Gagliardo*, 489 F.3d at 113; *see*

*also Walczak*, 142 F.3d at 129 (stating that "[w]hile federal courts do not simply rubber

stamp administrative decisions, they are expected to give 'due weight' to these proceedings").

Relegated to this narrowly circumscribed role, district courts are not permitted to make "subjective credibility assessment[s]," and cannot "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *Grim*, 346 F.3d at 383. For this reason, district courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal citations omitted). Deference to the final decision is particularly appropriate when "the state hearing officers' review has been thorough and careful," *Walczak*, 142 F.3d at 129, and his or her factual findings are "reasoned and supported by the record." *Gagliardo*, 489 F.3d at 114.

## FACTUAL BACKGROUND

**R.N.'s Past Progress**

At the time of the parties' cross-motions, R.N. was a 14-year old student diagnosed with double-deficit Dyslexia. Dkt. #31-2, ¶ 1. For several years, R.N. attended the district and received services as a student with a learning disability. Dkt. #31-2, ¶ 2. R.N. was initially classified as a learning disabled student in the first grade. Dkt. #31-2, ¶ 4. During the 2006-07 school year, R.N. was taught in a first

grade general education classroom where he received speech/language and occupational therapy ("OT") services. Dkt. #31-2, ¶ 4. During that same school year, R.N. was neurologically evaluated by Lisa A. Jackson, Ph.D., using the Weschler Individual Achievement Test-II. Dkt. #31-2, ¶¶ 5-6. On subtests measuring R.N.'s math abilities, he performed at a 1.1 grade equivalent on Math Reasoning and a 1.5 grade equivalent on Numerical Operations, both within the average range. Dkt. #31-2, ¶ 7. With respect to reading, R.N. performed poorly with a K.9 grade equivalency in Word Reading; a below first grade equivalency in Reading Comprehension; a Pre-K grade equivalency in Pseudoword Decoding; and a K.7 grade equivalency in Spelling. Dkt. #31-2, ¶ 8.

During R.N.'s second grade year (2007-08), his placement was changed from a general education classroom to a 12:1:1 (12 students, one teacher, and one paraprofessional) self-contained, special education classroom with his speech/language and OT services continued. Dkt. #29, ¶ 7; Dkt. #31-2, ¶¶ 9, 10. The District also began specialized reading instruction for R.N., using a program known as Sonday. Dkt. #31-2, ¶ 11. These same parameters were in place for R.N.'s third grade year (2008-09). Dkt. #32-1, ¶ 12. For the 2009-10 school year, R.N.'s fourth grade year, the CSE recommended that R.N. be changed to a general education classroom with 12:1:1 math, consultant teacher services for Language Arts on a daily basis, and a Reading Lab service every other day. Dkt. #31-2, ¶¶ 13-15.

At the March 30, 2009 CSE meeting, A.N., R.N.'s mother, strenuously objected to him being removed from a 12:1:1 special education classroom and placed in a general education classroom.  Dkt. #31-2, ¶16.  R.N. read to the Committee a letter, which stated in relevant part:

> …I am not in agreement with R.N.'s placement [in a general education class].  This academic year R.N. was pulled out for science and social studies.  He is <u>not</u> successful at all in a reg[ular] class room.  Constant reminders from Mrs. Booker are needed to keep my son's attention.  He is not ready for a regular classroom.
>
> R.N. has been in a 12:1:1 setting for 2 years with thankfully only 5 students.  There has been very little preparation for him to be prepared for 4th grade.  I have been told over and over again by his teacher that he truly struggles in a reg[ular] class room.  Initially, [R.N.] was destined to go to 12:1:1 at [Iroquois Intermediate] but because of the dynamics in the classroom you have chose[n] to set my son up for failure.
>
> K.J. [CSE Chairperson] you told me that you are not a believer in holding a child back a grade.  So why are there students being held back?  Is it because [they are] not prepared for [Iroquois Intermediate] or because [Iroquois Intermediate] does not have a program to fit their needs[?]  This district is in dire need of a 12:1:1 with high functioning lower academics program.
>
> I am not reaching for the stars.  This is a program that could happen and would help not only [R.N.] but many other students coming to [Iroquois Intermediate].
>
> Shame on all of you for setting my son and many other students up for failure.

(Parent's Exh. M).[1]  The CSE adopted the change to R.N.'s placement moving him to a general education classroom over A.N.'s objection.  (Dist. Exh. 18, p. 1).

---

[1] "Parent's Exh. ___" and "Dist. Exh. ___" refer to Exhibits presented by the respective parties at the due process hearing before the IHO.  They are part of the administrative record which is not electronically filed in IDEA cases.

In October and November of 2009, the beginning of R.N.'s fourth grade year, Dr. Jackson performed updated testing on him using the Woodcock-Johnson III. Dkt. #31-2, ¶¶ 17-18.  R.N.'s testing yielded the following results:  a 2.3 grade equivalency on Letter/Word Identification, a 2.1 grade equivalency on Passage Comprehension, a 2.4 grade equivalency on Word Attack, a 2.6 grade equivalency on Spelling, a 2.1 grade equivalency on Writing Samples, a 2.8 grade equivalency on Applied Problems, a 2.1 grade equivalency on Calculation, and a 2.1 grade equivalency on Spelling of Sounds, placing him approximately 2 years behind his same-aged peers. Dkt. #31-2, ¶ 18.  These results showed an increase in the gap between R.N. and his same-aged peers from one year behind in 2007 to two years behind in 2009.  Dkt. #31-2, p. 18.  Nonetheless, at a meeting held on March 24, 2010, the CSE decided to continue R.N. in the general education classroom for his fifth grade year, except for math where he was continued in a 12:1:1, with no changes to his reading instruction. Dkt. #31-2, ¶ 19.

In March of 2011, during R.N.'s fifth grade year, he was evaluated by the District psychologist, Melissa Russin, Ph.D.  Dkt. #31-2, ¶ 20; Dist. Exh. 46.  On the Woodcock Johnson III Tests, R.N. measured as follows:  in the "Low" range in the areas of Letter/Word Identification (2.8 grade equivalency), Spelling (2.5 grade equivalency), and Calculation (3.5 grade equivalency); in the "Very Low" range in Passage Comprehension (1.5 grade equivalency); and in the "Low Average" range in Reading Fluency (3.2 grade equivalency).  Dkt. #31-2, ¶¶ 21-24.  These results showed a

widening of the gap between R.N. and his same-aged peers, with R.N. now two to three years behind his peers in most areas.  Dkt. #31-2, ¶¶ 25-26.

When the CSE met on March 28, 2011 to develop R.N.'s IEP for his sixth grade year, it was recommended that R.N. be continued in a general education classroom with Math Lab, ISP, and Reading Lab (with instruction using the Sonday system) taught in a special education classroom.  Dkt. #31-2, ¶¶ 27, 30; Dist. Exh. 17.  The CSE also reduced the frequency of R.N.'s consultant teacher services for English from a daily basis to four times per six-day cycle and added group counseling as a related service.  Dkt. #31-2, ¶¶ 28, 31; Dist. Exh. 17.  The CSE reconvened on November 23, 2011, at which time the District's Director of Instruction, Student Services and Assessment, Mrs. Kristin Kendall-Jakus, informed A.N. that there were two options for R.N.: (1) keep him in the general education environment; or (2) change his placement to a 12:1:1 special education classroom.  Dkt. #31-2, ¶ 34.  The CSE ultimately chose to place R.N. in a 12:1:1 classroom for all of his core academic subjects because as she testified at the hearing before the IHO, "R.N. was struggling dramatically."  Dkt. #31-2, ¶ 35; Tr. pp. 69-70.[2]  Under this IEP, R.N. continued to receive specialized reading instruction using the Sonday system.  Dkt. #31-2.

In January of 2012, R.N. was evaluated by a licensed psychologist, Jack Nocera, Ph.D.  Dkt. #31-2, ¶ 37.  Dr. Nocera reported that according to the Woodcock-Johnson III Normative Update Tests, R.N. was functioning at a 2.9 grade equivalency for Letter Word Identification, a 2.8 grade equivalency for Word Attack, a 3.4 grade

---

[2] References to "Tr." are to the transcript of the hearing before the IHO.

equivalency for Passage Comprehension, a 3.5 grade equivalency for Calculation, a 2.0 grade equivalency for Math Fluency, and a 3.1 grade equivalency for Math Calculation. Dkt. #31-2, ¶¶ 39, 40.  At this point, R.N. was in the sixth grade.

After R.N.'s placement changed to a 12:1:1 setting in the middle of his sixth grade year, he objected to going to school and there were days when his mother had to drag R.N. out of bed.  Dkt. 31-2, ¶¶ 42, 43.  As a result, the CSE amended R.N.'s IEP to add individual counseling services and R.N. began to visit the school counselor, Mary Lou Meaker.  Dkt. #31-2, ¶ 44.  R.N. continued to experience anxiety, so Mrs. Meaker furnished a list of private mental health counselors.  Dkt. #31-2, ¶ 46. R.N.'s Parents paid for R.N. to see an outside counselor, Stacey Stevens.  Dkt. #31-2, ¶ 48.  At the hearing, Mrs. Stevens testified that R.N. expressed frustration and anxiety about being in a special education classroom, being teased by his former general education friends, and having Dyslexia.  Dkt. #31-2, ¶ 49.  R.N. described himself to Mrs. Stevens as being "stupid."  Dkt. #31-2, ¶ 49.  Mrs. Stevens testified that R.N. tried to "duck out" of this special education classroom "as early as possible so no one would see that he came out of that classroom because kids would yell things to him like BOCES."  Tr. at 922-23.  Mrs. Stevens also testified that R.N. had an altercation with a boy who called R.N. "stupid," and that R.N.'s older brother got into a "pretty heated fight" on the bus with another student who called R.N. a name.  Tr. at 922.

R.N. did not use his laptop because he felt that it made him stand out from his peers.  R.N.'s seventh grade teacher, Marissa Merewether, testified that R.N. used his laptop infrequently, "because he didn't really like to use it."  Tr. at 419.  "In the classroom he never initiated to use it," she testified.  "I would offer it to him and sometimes he did and sometimes he didn't."  Tr. at 419.

**The June 4, 2012 Consent Decree**

On March 21, 2012, R.N.'s Parents filed a due process complaint alleging that the District failed to offer R.N. a FAPE.  Dkt. #31-2, ¶ 52; Dist. Exh. 5.  R.N.'s Parents alleged that despite the District's interventions, R.N. was not making reasonable educational progress, particularly in the areas of reading and math.  Dkt. #31-2, ¶ 53.  The due process complaint was resolved by a Consent Decree dated June 4, 2012, through which the District agreed to bring in an outside reading specialist, Dorothea Mobius, to provide R.N. with reading instruction, and to provide a reading evaluation of R.N. by Ronald W. Schworm, Ph.D., a math assessment by the District psychologist Melissa Russin, and an assistive technology evaluation by the University at Buffalo Center for Assistive Technology.  Dkt. #31-2, ¶¶ 55, 56.

In May 23, 2012, Dr. Schworm tested R.N.'s reading abilities using several measures.  Dist. Exh. 44.  The Woodcock Reading Mastery Test – Revised, revealed that R.N. was performing at the following grade equivalency levels in the specified areas:  2.6 in Word Identification; 2.4 in Word Attack; and 3.4 in Passage

Comprehension.  Dist. Exh. 44, pp. 5-6.[3]  On the Test of Written Spelling – 4, R.N.'s

scores placed him at a 1.7 grade equivalent for spelling skills.  Dist. Exh. 44, p. 7.  R.N.

performed better on the Spelling of Sounds test from the Woodcock-Johnson III Tests of

Achievement, placing in the upper third grade level of skill (3.8).  Dist. Exh. 44, p. 7.

Using *Diagnostic Indicators of Basic Early Literacy Skills* ("DIBELS"), Dr. Schworm

determined that R.N.'s oral reading rate was "well below" his sixth grade level.  Dist.

Exh. 44, pp. 6-7.  Dr. Schworm reported that R.N. was "unable to read independently

the fourth grade level story."  Dist. Exh. 44, p. 6.


      Dr. Schworm opined that:

> Continued use of the Sonday reading system in view of R.N.'s slow rate of
> response or progress should be examined.  R.N.'s word learning problems
> are significant and severe.  A more intense, systemic approach may be
> needed if [R.N.] has been involved in exercises and activities at the
> intermediate level of word learning and his rate of progress has stalled.  A
> higher rate of responding and different instructional techniques than those
> included in the Sonday Reading System may be needed.

Dist. Exh. 44, p. 11.


      Dr. Russin's evaluation, completed in June 2012, revealed that R.N.

exhibited symbol confusion of addition/multiplication signs, and deficits in basic math

computation.  Dkt. #32-1, ¶¶ 62-64.

---

[3] These page numbers refer to those that were hand written on the bottom right of the pages of District Exhibit 44 during the hearing before the IHO.

The University at Buffalo Center for Assistive Technology recommended that R.N. be provided with math software, an upgrade of R.N.'s laptop to include a newer version of a web browser to support other recommended assistive devices, training time, and staff development for those working with R.N.  Dkt. #31-2, ¶ 99.  At no time did the CSE revise R.N.'s IEP to include this technology or training.  Dkt. #31-2, ¶ 100.

**The August 20, 2012 CSE Meeting**

At the August 20, 2012 meeting, the CSE reviewed Dr. Russin's evaluation but did not make any changes to R.N.'s math services except to add a math goal for R.N. to "increase progress in basic math skills as demonstrated by making progress toward the trend line with 5 consecutive points moving toward the trend line."  Dkt. #31-2, ¶ 66.  To measure achievement on this goal, it was anticipated that R.N.'s math data would be entered into AIMSweb, the District's benchmarking program, which generates a chart with trend lines.  Tr. at 413; *see, e.g.,* Parent's Exh. Z.  Also at the meeting, it was decided that R.N. would continue to be placed in a 12:1:1 special education classroom for seventh grade with specialized reading instruction (Sonday) four times per six-day cycle.  Dkt. #31-2, ¶¶ 72-74.  According to Mrs. Merewether, R.N.'s math progress was not entered into AIMSweb that Fall semester, "because the district at the time was not using the math portion as far as monitoring goes."  Tr. at 414. Instead, Mrs. Merewether tracked R.N.'s progress herself.  Dkt. #31-2, ¶ 67.

During the Summer of 2012, prior to R.N. going into the seventh grade, Mrs. Moebius began giving specialized reading instruction to R.N.  Dkt. #31-2, ¶ 69. Mrs. Moebius reported that at her first session with R.N., he was "unable to clearly define or even guess at some very basic elements of language structure, such as what a vowel is and what a consonant is," and "his writing was very messy, not anchored to the line, [and] had 'b' and 'd' issues."  Parent's Exh. P.  After teaching R.N. for approximately nine sessions, Mr. Moebius felt "very encouraged by his willingness to work hard, and to apply what [she had] been teaching," but stated, "we have a long way to go."  Parent's Exh. P.  She wrote to Mrs. Kendall-Jakus, "[m]y analogy for R.N., as for many kids I have taught, is a 'skipping stone;' that is, a child who smiles sweetly, and acts as if he 'gets it', like a stone skipping across the water, but when the water gets deeper and he runs out of momentum, he sinks."  Parent's Exh. P.

When R.N. entered the 12:1:1 classroom in the seventh grade, his anxiety continued; and according to A.N., it was a near-daily struggle to get R.N. to go to school.  Dkt. #31-2, ¶¶ 76, 77.  Sometimes, A.N. could not get R.N. to go to school. Dkt. #31-2, ¶ 77.

**The November 20, 2012 CSE Meeting**

On November 20, 2012, the CSE convened to discuss R.N.'s academic performance.  Dkt. #31-2, ¶ 78.  In relevant part, R.N.'s "Present Levels of Performance" were reported in the resulting IEP as follows:

> [R.N.] has been receiving extra support (one on one and small
> group) through a multi-sensory phonetic reading program.  He has

made some progress this year, but progress has not been substantial.  He is being progress monitored through a curriculum based measurement.  Currently he is being monitored at a 2nd grade level.  His difficulties remain in quickly decoding when he reads. . . . He still struggles with mastering sounds and seems to have regressed with sounds that were currently mastered.

. . .

In math, [R.N.] struggles with new material until he has had repetition and enough practice of the skill.  He is well below grade level with basic computational skills.  He is working on mastering these skills using the Touch [M]ath program.  [R.N.] has shown some success with this strategy taught.  When computation is not the primary skill being assessed on a task, R.N. has been allowed the use of a calculator and math charts.  This ensures that skills being assessed are not penalized by errors in computation.

Dist. Exh. 8, p. 3.

Present by phone at the CSE meeting was Lisa Kilanowski-Press, D.Ed., an expert in learning disabilities, whom the District contracted with to develop the District's response to intervention program and to provide staff development for special education personnel on various topics, including Dyslexia.  Dist. Exh. 8; Tr. at 160-61.  At that time, Dr. Kilanowski-Press "strongly suggested" that the District replace R.N.'s current reading program, Sonday, with another program called RAVE-O (retrieval, automaticity, vocabulary, and orthography), but the District did not yet have the program.   Dist. Exh. 23, p. 2; Tr. at 100-101; Dkt. #29-5, ¶ 24.

**R.N.'s Assessment at the Gow School**

On January 11, 2012, R.N.'s Parents arranged for an Admissions Assessment for R.N. by Dr. Mari Jo Renick at the Gow School, a private school specializing in the education of students with Dyslexia and other language based

learning disabilities. Dkt. # 29-5, ¶¶ 20, 21; Dkt. #31-2, ¶ 81. Dr. Renick noted that R.N. demonstrated difficulty with lexical retrieval or word finding, accurately defining only one out of five words presented to him on the Slosson Oral Reading Test-Revised, which placed R.N. at a 3.7 grade equivalency. Dkt. #31-2, ¶ 84. On the Gray Oral Reading Test – 5th Edition, R.N. achieved a 2.0 grade equivalency in reading rate, a 1.2 grade equivalency in accuracy, a 1.7 grade equivalency in fluency, and a 3.4 grade equivalency in comprehension. Dkt. #31-2, ¶ 85. On the Test of Written Language – 4th Edition, R.N. tested at a 3.0 grade equivalency in Contextual Conventions and below a 3.0 grade equivalency in Story Composition. Dkt. #31-2, ¶¶ 87-88. On the Rapid Automatized Naming & Rapid Alternating Stimulus Tests, R.N. tested at a second or third grade level on all measures: Objects (2.0 grade level); Colors (3.0 grade level); Numbers (2.0 grade level), Letters (3.7 grade level), Letters/Numbers (3.0 grade level) and Numbers/Letters/Colors (2.4 grade level). Dkt. #31-2, ¶ 89. Dr. Renick described R.N.'s oral reading as "very slow, effortful, and error-prone." Dkt. #31-2, ¶ 86.

R.N.'s Parents put the District on notice on January 15, 2013, that they intended to remove R.N. from the District, place him at the Gow School, and seek reimbursement from the District. Dkt. #31-2, ¶ 90. The Parents paid the Gow School the non-refundable tuition for the semester shortly thereafter. Tr. at 1182-83.

**The January 25, 2013 CSE Meeting**

The District convened a CSE meeting on January 25, 2013.  Dkt. #31-2,

¶ 91.  At the meeting, A.N. was provided with a report, dated January 22, 2013, from

Dr. Kilanowski-Press, the District's special education consultant.  Dkt. # 31-2, ¶ 92.  In

the report, Dr. Kilanowski-Press opined that based on R.N.'s progress monitoring

reports ("AIMSweb RCBM"), R.N. would be reading on a fifth grade level by the end of

the 2012-13 school year:[4]

> Given that R.N.'s overall benchmark at the 3rd grade level improved to a
> sufficient degree to warrant progress monitoring at the next grade level,
> [R.N.] began progress monitoring using grade 4 probes.  Between the
> period of 11/27/2012 and 1/16/2013, [R.N.] achieved a rate of
> improvement of .5 words per week.  The average rate of improvement for
> students at [R.N.'s] chronological grade (grade 7) is .64 words read
> correctly per week.  Based on the progress monitoring data garnered
> during this period, R.N.'s reading rate of improvement fell below the
> expected rate of .89 for 4th grade students, and below the expected rate
> of .64 for 7th grade students.  However, it is important to note that the
> transition in difficulty level of the passages at which [R.N.] is being
> monitored likely contributes to his current rate of improvement.  Additional
> time in intervention would be recommended prior to reevaluating his rate
> of improvement and response to intervention.  Should [R.N.] continue to
> progress at the same rate of improvement, [R.N.] will be reading at a rate
> of 98.5 words read correctly in 20 weeks.  [R.N.'s] goal for RCBM
> measure is noted as 101 words correctly per minute.  It is highly plausible
> given [R.N.'s] current trajectory (rate of improvement) that R.N. will meet
> his goal prior to the close of this academic year, moving his progress
> monitoring level to grade 5.  If such is the case, [R.N.] will have raised his
> progress monitoring and benchmark level three grade levels within one
> academic year.

Dist. Exh. 36.  Dr. Kilanowski-Press was not present at the meeting and had never met

or observed R.N.  Dkt. #31-2, ¶¶ 93-94.  Before the hearing officer, Dr. Kilanowski-

Press testified "you can take historical data about student achievements and attempt to

---

[4] "RCBM" stands for Reading Curriculum-Based Measure.  Tr. at 253.

make predictions about where they will be, [but] here is no guarantee about anything."

Tr. at 263.

The January 25, 2013 IEP recommended that the RAVE-O reading program, which was previously unavailable, be provided to R.N. in addition to Sonday. Dkt. #29-5, ¶ 24.  According to the Present Levels of Educational Performance section of the IEP, "[i]n addition to the instruction in the 12:1:1 math class, [R.N.] receives Academic Intervention targeting foundational math skills 2 to 3 times in a six day cycle for 30 minutes."  Dist. Exh. 7, p. 7.  Mrs. Kendall-Jakus testified that "an Academic Intervention Service is not officially a Special Education Service," and for this reason it is not always explicitly noted in the IEP.  Tr. at 746-48.  In R.N.'s case, she testified, the Academic Intervention Service targeting math skills was provided one-to-one but because the IEP did not explicitly state that it would be provided individually, "[i]t would be at the discretion of the teacher to pull him one-to-one."  Tr. at 747.  "If there were other children with similar needs, she would put two, but in R.N.'s case, it was one-to-one."  Tr. at 747.

According to A.N., the CSE was "try[ing] to fit in [R.N.'s] schedule one-on-one math" at the January 2013 meeting.  Tr. at 1169.  After R.N.'s placement at the Gow School, R.N.'s Parents received a "Prior Written Notice" dated February 21, 2013, stating that "[t]he CSE recommended that Academic Intervention support targeting math be provided 1:1."  Dist. Exh. 49, p. 49.  "For this reason," the Notice read, "[R.N.] will

receive math intervention support 1:1 vs. in a group." Dist. Exh. 49, p. 1; Dkt #32-1, ¶ 109.

**The Gow School**

R.N. began attending the Gow School on February 1, 2013. Dkt. #31-2, ¶ 115. The Gow School is a private school, accredited by the New York Chapter of the National Association of Independent Schools, for students in grades 7 through 12 with Dyslexia and other language-based learning disabilities and Dyscalculia (difficulty in math). Dkt. #31-2, ¶¶ 116-18. The Gow School has not been approved by the New York State Commissioner of Education as a school with which school districts may contract to provide special education services to students with disabilities. Dkt. #29-5, ¶ 20.

Gow offers classes six days per week and the majority of students reside at the school. Dkt. #31-2, ¶ 120. Because R.N. resides so close to the school, he was accepted as a day student. Dkt. #31-2, ¶ 120. Gow employs a remedial reading program called Reconstructive Language ("RL"), a multisensory, structured, and cumulative program, consisting of four elements: phonics, spelling, vocabulary, and oral reading for fluency and comprehension. Dkt. #32-1, ¶¶ 121-23. RL involves drill and repetition and application. Dkt. #31-2, ¶ 124. All of the teachers at Gow are trained in RL and Gow's RL department is certified by the International Multisensory Structured Language Counsel. Dkt. #31-2, ¶ 125.

When a student is admitted, Gow administers placement tests and assigns students to RL and math classes based on the student's needs and abilities. Dkt. #31-2, ¶ 127.  Classes at Gow typically have four to seven students and some classes have teaching assistants.  Dkt. #31-2, ¶ 128.  Gow has a daily study hall with tutorials available for students who are struggling in academic areas.  Dkt. #31-2, ¶¶ 129-30.  Gow also employs a program called Constructive Writing to help students develop their writing skills.  Dkt. #31-2, ¶ 131.  R.N. was enrolled in a RL class with four students, a Constructive Writing class, and a multisensory math class (1:1).  He also received 1:1 RL instruction (at least twice per week) and 1:1 math instruction (once every other week) during study halls.  Dkt #31-2, ¶¶ 135-39.

After R.N.'s enrollment at the Gow School, R.N.'s Parents had him re-evaluated at their own expense by Dr. Schworm and Dr. Nocera on February 8, 2013 and March 9, 2013, respectively.  Dkt. #29-5, ¶¶ 27-28.  However, the SRO deemed the results of these evaluations inadmissible because the evaluations were not before the CSE when it formulated R.N.'s January 2013 IEP.  Dkt. #20-1, p. 13.

**The Due Process Hearing**

On or about March 29, 2013, R.N.'s Parents commenced an administrative hearing by filing a due process complaint against the District seeking reimbursement for tuition paid to the Gow School for a portion of the 2012-2013 school year (from approximately February 1, 2013 to June 30, 2013).  Dkt. #29-5, ¶ 30.  On June 4, 2013, the parties conducted a hearing before Impartial Hearing Officer Mindy G.

Wolman.  Dkt. #29-5, ¶ 31.  During five days of testimony, IHO Wolman heard from the following witnesses:   Mrs. Kendall-Jakus, Director of Instruction, Student Services and Assessment, for the District (Tr. at 58); Dr. Kilanowski-Press, the District's educational consultant (Tr. at 240); Mrs. Merewether, R.N.'s special education teacher between December 2011 and January 2013 (Tr. at 352); Kristen Bittner, R.N.'s special education reading instructor at the District (Tr. at 430); Dr. Nocera, the psychologist who evaluated R.N. in 2012 and 2013 (Tr. at 818); Stacy Stevens, R.N.'s private mental health counselor (Tr. at 912); A.N., R.N.'s mother (Tr. at 957); Jeffrey Sweet, head of the Middle School at the Gow School  (Tr. at 454); Kathleen Rose, Chair of the Reconstructive Language Program at the Gow School (Tr. at 510); Joseph Cendrowski, R.N.'s math teacher at the Gow School (Tr. at 591); Dr. Mary Jo Renick, the Director of Research and Assessment at the Gow School (Tr. at 1005); and R.N., the student (Tr. at 1187).

A.N. testified that she became concerned that R.N. was delayed when he was in the first grade and A.N.'s sister, a teacher's aide, noticed that R.N. was not writing letters or basic numbers.  Tr. at 960-61.  A.N. recounted the "slow" and "minimal" progress R.N. made in his 12:1:1 special education classroom from first through third grade.  Tr. at 964-69.  A.N. objected to R.N. being mainstreamed in the fourth grade because he "hadn't made any progress in the way of school."  Tr. at 971.  "It seemed like he was getting . . . thrown to the wolves."  Tr. at 971.  The District advised A.N. that there was a smaller group setting but it was not a good fit because the children were functioning at a lower level than R.N.  Tr. at 972.  A.N. testified that after Dr. Jackson

evaluated R.N. in October of 2009, she advised A.N. that she had "big concerns" about R.N. and that "the gap was growing." Tr. at 974. A.N. testified that she shared Dr. Jackson's findings with the District but they would not change his classroom placement. Tr. at 974.

A.N. testified that although R.N.'s teachers thought he was doing "fantastic," A.N. felt that R.N. struggled to do his school work, was "clearly not getting it," and "was not understanding it." Tr. at 976. She testified:

> I would call my sister and say I don't understand how I can go through the homework with him and I know he doesn't have it, he doesn't understand it, he doesn't have it. He doesn't get it and it's not even close. And then yet he would go to school and have these crazy scores like 90s.

Tr. at 977. When R.N. was in the fifth grade, A.N. discussed her concerns about R.N.'s teachers "inflating" his scores. Tr. at 980. "It was clear that R.N. was not getting those scores," A.N. testified. Tr. at 980.

A.N. testified that after Dr. Russin, the school psychologist, conducted testing on R.N., she advised A.N. that R.N. was "going to hit the wall" in middle school. Tr. at 981-82. Nonetheless, R.N. was placed in a mainstreamed classroom for the sixth grade, where according to A.N., "[h]e fell apart." Tr. at 983. A.N. testified that all of R.N.'s teachers "had concerns for [him]," and he had very low grades in the general education classroom. Tr. at 984.

After R.N. was transferred into a special education class mid-year in sixth grade, he complained to his mother that there were a lot of distractions in the 12:1:1 classroom.  Tr. at 1121.  He was concerned that his friends in the general education class would see him with his 12:1:1 class in the auditorium or at lunch.  Tr. at 996-97, 1151-52.  A.N. testified that she had a sleepover party with a group of kids from R.N.'s general education class, that they called R.N. a "retard," and he "totally acted out" on them.  Tr. at 1157.  Another time, according to A.N., someone called R.N. a "retard" in the hallway at school and R.N. was "mortified."  Tr. at 1160-61.  At football, none of his former friends would talk to him.  Tr. at 1162.  R.N. told his mother every morning that he hated school.  Tr. at 1159.

Mrs. Kendall-Jakus testified that the CSE recommended that R.N. be placed in a 12:1:1 classroom in the sixth grade because R.N. was "struggling dramatically" in the general education classroom and needed a smaller setting to survive.  Tr. at 67, 69.  She testified that "one of [R.N.'s] greatest issues was also his anxiety."  Tr. at 136.

With respect to R.N.'s 12:1:1 placement, Mrs. Kendall-Jakus testified that "[e]very child in the classroom had limited ability" and was classified as "learning disabled."  Tr. at 90.  In terms of IQ and skill levels in reading comprehension and fluency, R.N. was "very similar" to the other students in his class, she testified.  Tr. at 91.

Mrs. Merewether testified that R.N. was "in the middle" of the range students in the class academically with greater reading needs. Tr. at 357. "The only anxiety I saw was just with him wanting to, for example, leave for speech when there wasn't a change in the lunch period." Tr. at 385. She testified that there were some students in the classroom who exhibited oppositional and impulsive behaviors frequently and/or had behavior management programs, but R.N. was not one of them. Tr. at 390, 393. During R.N.'s sixth grade, another student was removed from the classroom because of his behaviors. Tr. at 395. Mrs. Merewether confirmed that A.N. asked her to move R.N. away from the door because he did not want to be seen by his peers in the 12:1:1 classroom and that A.N. told her that R.N. did not want to go to school. Tr. at 397.

With respect to academics, Mrs. Merewether admitted that R.N.'s goals for his seventh grade year targeting basic math were more elementary than the higher order math skills R.N. was working on at the end of his sixth grade year. Tr. at 406-408. She admitted that R.N.'s seventh grade goals of telling time to the minute, quarter hour, and half hour, and of making change up to a dollar, were skills typically mastered in elementary school. Tr. at 424-25. In sixth grade, R.N. averaged 80.67 in the first marking period, 88.35 during the second, 88.00 during the third marking period, and 87.83 in the fourth marking period. Dist. Exh. 27. In seventh grade, R.N. averaged 88.36 for the first and second marking periods. Dist. Exh. 26. Mrs. Merewether agreed that R.N.'s curriculum was "highly modified" from that of a seventh grade student in the

general education environment and that R.N.'s grades were reflective of how he performed in that modified curriculum.  Tr. at 415.

Under R.N.'s August 20, 2012 IEP, R.N. received reading instruction four times every six days for 50 minutes.  Dkt. #9, p. 7.  According to Mrs. Kendall-Jakus, reading services were significantly increased over the Summer with R.N. being instructed four times a week for 60 minutes with Mrs. Moebius, who had been specifically requested by the parents.  Tr. at 71-72, 84.  Mrs. Kendall-Jakus testified that R.N liked working with Mrs. Moebius, and "felt like he was learning."  Tr. at 780.  Mrs. Moebius advised the District that she was going to be "doing a lot of traveling" during the school year and could not teach R.N. more than two times per six-day cycle.  Tr. at 779.  Accordingly, R.N.'s reading instruction was adjusted for the 2012-13 school year.  Specifically, Mrs. Bittner, who was not a certified reading specialist, instructed R.N. two of the four days and Mrs. Moebius taught R.N. the rest of the time.  Tr. at 96-97, 432-33.

Mrs. Bittner testified that Sonday had different "Systems," with "Sonday System 2 being more advanced than Sonday System 1."  Tr. at 435.  It was the understanding of Mrs. Kendall-Jakus that R.N. mastered nine levels of Sonday 1 in four months.  Tr. at 150.  Mrs. Bittner also testified that RAVE-O, the reading program added to R.N.'s January 2013 IEP, "continues with what Sonday does . . . just in a more interactive multisensory way, much more visual, [with] pictures."  Tr. at 443.

Dr. Nocera testified that "R.N.'s skills were splintered[;] [h]e had some strengths and he had some definitive weaknesses."  Tr. at 827.  Dr. Nocera acknowledged R.N.'s subscores on the 2007 Weschler Intelligence Scale for Children – IV revealed that:  his verbal comprehension was in the average range (100); his perceptual reasoning in the low average range (88); his working memory[5] was deficient (68); and his processing speed was in the low average range (83), yielding a full scale IQ of 84.  Tr. at 828.  Based on his testing, Dr. Nocera opined that R.N. "does have the intellectual capacity to learn and to acquire new information."  Tr. at 832.  "R.N. is able to listen to directions and listen to material, understand it, follow the directions correctly within the average range for his age and grade," Dr. Nocera testified.  Tr. at 833.

Nonetheless, Dr. Nocera testified that based on the 2012 testing he administered, R.N. was "not on par with his peers," with reading skills "pretty much . . . in the [second] grade range plus," Tr. at 835, and math skills at the second or third grade level.  Tr. at 837.  Comparing R.N.'s scores from January of 2012 and subsequent testing in January of 2013, Dr. Nocera testified, "the numbers show virtually no change."  Tr. at 860-61.  "Given his cognitive profile," Dr. Nocera testified," I would have expected him to make some gains."  Tr. at 871.

Mrs. Stevens, the private mental health counselor who R.N. saw at his Parents' expense starting in February of 2012, testified that R.N. was not happy with his school placement and "did not know where he fit in."  Tr. at 917, 920.  According to

---

[5] According to Dr. Nocera, "working memory involves a person's ability to take some information, store it in their head and do something with it and put it back out."  Tr. at 883.

Mrs. Stevens, R.N. reported to her that he did not like the Sonday program and "felt like he made it through [sixth] grade without learning how to read." Tr. at 926.

Mr. Sweet, Gow's Middle School Director, testified that Gow admits students who have average IQs but are not achieving academically. Tr. at 456-57, 478. A typical Gow student, he testified, would have extensive needs in the area of reading. Tr. at 461. Mr. Sweet testified that every student at Gow has a laptop and the students use assistive technology on a daily basis. Tr. at 476.

R.N. testified that while at the District, "for some time I was in regular classes, but then I kept getting switched to 12:1:1." Tr. at 1189. Regarding his special education class, R.N. testified,

> I always had kids yelling out in the middle of class. They were disruptive and I couldn't really think. . . . I never used the computer.
> . . . .
> My friends knew I was in the 12:1:1 and they just stopped talking to me. No one really talked to me except for one of my friends in the 12:1:1 class.

Tr. at 1190-91. R.N. testified that he did not feel like he was learning using the Sonday system, that he was not encouraged to use his computer, and did not know how to use it. Tr. at 1199-201. He testified that the "regular" class work at Iroquois was much harder than the work he was getting in the special education classroom at the District. Tr. at 1206. R.N. testified that he would rather "drop out" of school than return to the District. Tr. at 1206-07.

**The IHO's Decision**

On October 17, 2013, IHO Wolman entered an Order finding in favor of the Parents and directing the District to reimburse them for tuition for the Gow School. Dkt. #30-1, pp. 36-37.  In relevant part, the IHO found the following:  R.N. made minimal progress in reading and math during the school years leading up to the 2012-13 school year (Dkt. #30-1, p. 12); Dr. Kilanowski-Press' report, prepared after the parents notified the District of their intent to unilaterally place R.N. at Gow, appeared to have been prepared for the sole purpose of opposing a parental tuition reimbursement claim (Dkt. #30-1, p. 14); Dr. Kilanowski-Press' projections about the progress the student would have made was "highly speculative" given the "high level of variability in [R.N.'s past] performance" documented through AIMSweb during the 2012-13 school year (Dkt. #30-1, p. 15); at best, R.N. "made trivial progress in multiplication and division, and appears to have regressed somewhat in addition and subtraction" during this same time period (Dkt. #30-1, p. 17); R.N. had previously received instruction through the Sonday system, but had to restart the program from the beginning because he was confused about "many basic terms and concepts that should have been familiar to him" (Dkt. #30-1, p. 18); by January 2013, R.N. had mastered nine levels of Sonday 2, but it was "unclear  . . . how much (if any) progress reflected new material and how much reflected re-mastery of previously learned material," or how much of the progress was made during the Summer of 2012 (exclusively with Mrs. Moebius, a certified reading instructor) as opposed to the period between September 2012 and January 2013 (when reading instruction was split between Mrs. Moebius and Mrs. Bittner, who is not a reading specialist) (Dkt. #30-1, pp. 18-19); by January 22, 2013, R.N. had not

progressed from a Level 9 in the Sunday reading program since October 11, 2012 (Dkt. #30-1, p. 19); and "[h]aving made no measurable progress in the Sunday 2 reading program from October 11 through January 22 (just over three months), it was "hard to believe" that R.N. would have progressed nine more levels by the end of the 2012-13 academic year (in approximately five months) (Dkt. #30-1, p. 20).

Regarding R.N.'s grades, the IHO found that they did not warrant a finding that R.N. had made "meaningful educational progress," because the grades were "subjective assessments" of R.N.'s performance in "classes with highly modified curricula." Dkt. #30-1, p. 20. Based on these findings, the IHO concluded that R.N. did not make sufficient progress under the August 20, 2012, and November 20, 2012 IEPs. Dkt. #30-1, p. 20.

The IHO noted that the January 25, 2013 IEP recommended "the same basic program" as the two previous IEPs, but reduced the frequency of R.N.'s Sunday reading instruction and added RAVE-O as a second reading program. Dkt. #30-1, p. 20. Given R.N.'s lack of progress in Sunday at the greater frequency under the prior IEP, the IHO opined that it was less likely that R.N. would progress with Sunday at a lesser frequency under the new IEP. Dkt. #30-1, pp. 20-21. Regarding the addition of RAVE-O, the IHO noted: Dr. Kilanowski-Press' opinion that RAVE-O was necessary to address R.N.'s double-deficit Dyslexia was "actually inconsistent with the District's position that the Student was making great progress with Sunday" (Dkt. #30-1, p. 21); R.N. had difficulty retaining skills and required consistency, structure, and repetition in

his instruction, and having two differently-structured reading programs one or two days per week, was "likely to confuse" R.N. (Dkt. #30-1, p. 22); and Dr. Schworm, who had more familiarity with RAVE-O and R.N. than Dr. Kilanowski-Press, testified that using both RAVE-O and Sonday at the same time was not advisable and would confuse R.N. (Dkt. #30-1, p. 22).

Regarding R.N.'s math needs, the IHO found the following:  in the sixth grade, R.N.'s math skills were in the second to third grade level (Dkt. #30-1, p. 23); R.N.'s IEPs showed that over time, R.N. was "working with goals either similar to, or less advanced, tha[n] the goals he had mastered (or made progress toward) in prior school years," for example, R.N.'s January 2013 IEP had the goal of using manipulatives to solve one-step addition, subtraction, multiplication, and division, even though he had been performing multi-digit processes in 2010 and 2011 (Dkt. #30-1, p. 23); in addition, the Academic Intervention Services for math were not part of R.N.'s mandated Special Education Services in the January 25, 2013 IEP and therefore, could be discontinued at any time (Dkt. #30-1, pp. 23-24).

The IHO concluded that the February 21, 2013 Prior Written Notice from the District recommending that "Academic Intervention support targeting math be provided 1:1," constituted impermissible retrospective testimony.  Dkt. #30-1, p. 24.  The IHO defined retrospective testimony as "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement."  *R.E.*, 694 F.2d at 185.  Citing *R.E.*, the IHO recognized

that "[i]n determining the adequacy of an IEP, the parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision."  694 F. 2d at 187.  That the District agreed to provide R.N. with 1:1 math support after R.N. was already placed at the Gow School was not relevant in the IHO's estimation.  Dkt. #30-1, p. 25.  Based on the foregoing, the IHO concluded that the January 25, 2013 IEP would not have enabled R.N. to make meaningful education progress in reading or math.  Dkt. #30-1, pp. 22-23, 25.

The IHO also found that the District failed to meet its burden to show that R.N. was suitably placed in the 12:1:1 classroom because it did not furnish any information about the other students' math performance or "their social, emotional, and behavioral issues."  Dkt. #30-1, p. 25.  The IHO cited testimony that the other students in the class were disruptive, oppositional, and impulsive, and interfered with R.N.'s ability to learn.  Dkt. #30-1, pp. 25-26.  The IHO ultimately found that the District did not provide R.N. with an appropriate program and classroom for the second half of the 2012-13 school year.  Dkt. #30-1, p. 26.

With respect to R.N.'s private school placement, the IHO found that R.N.'s parents proved by a preponderance of the evidence that R.N.'s enrollment at Gow was reasonably calculated to enable him to receive educational benefits and likely to produce progress, not regression.  Dkt. #30-1, pp. 27-32.  Specifically, the IHO found that:  the structured, multisensory Reconstructive Language program employed at Gow

was "very effective for students with Dyslexia" (Dkt. #30-1, p. 29); R.N. benefitted from 1:1 multisensory instruction in his math class (Dkt. #30-1, p. 30); Gow provided R.N. with appropriate assistive technology, training, and support (Dkt. #30-1, p. 31); and R.N. was thriving socially at Gow and did not suffer from the anxiety that he had while in the District because he was "in a school in which all of the other students had similar special education needs." Dkt. #30-1, p. 31. The IHO determined that just because R.N.'s full scale IQ was lower than that of students typically accepted at Gow, this did not make R.N.'s placement there inappropriate. Dkt. #30-1, p. 32.

Finally, the IHO concluded that equitable factors weighed in favor of tuition reimbursement to R.N.'s parents. Dkt. #30-1, 32-36. The IHO rejected the District's contention that R.N.'s parents were non-compliant, finding that: the Parents did not withhold or revoke consent to speak with R.N.'s private therapist, because the District never asked to speak with her (Dkt. #30-1, p. 32); the Parents cooperated in good faith for years with the CSE and sent a 10-day notice of their intent to unilaterally place R.N. at the Gow School, and therefore, they were not just "going through the motions" of the CSE referral and evaluation to get tuition reimbursement (Dkt #30-1, p. 33-34); the fact that the parents delayed in turning over Dr. Schworm's and Dr. Nocera's 2013 evaluations was not relevant to whether they were entitled to tuition reimbursement as the documents did not exist at the time of R.N.'s unilateral placement (Dkt. #30-1, p. 34); and even if it was relevant, it was reasonable for the parents to have R.N. evaluated after Dr. Kilanowski-Press' January 22, 2013 report that R.N. was making substantial progress in reading (Dkt. #30-1, p. 35).

The IHO ordered the District to reimburse the Parents for the cost of R.N.'s enrollment at the Gow School during the period from February 1, 2013 to June 30, 2013.  Dkt. #30-1, pp. 36-37.  The District appealed and the Parents cross-appealed to the extent that the IHO's decision did not address all of the claims raised in their due process notice.  Dkt. #20-2, p. 2.

**The SRO's Decision**

On January 15, 2014, SRO Justyn P. Bates entered a decision reversing the IHO's decision, sustaining the District's appeal, and dismissing the parents' cross-appeal.  Dkt. #20-2, p. 25.  As an initial matter, the SRO concluded that "to the extent that the IHO relied upon [Dr. Schworm's] February 6, 2013 evaluation report in determining that the January 2013 IEP was not reasonably calculated to enable the student to receive educational benefits, such an analysis was not consistent with controlling legal authority requiring prospective analysis only."  Dkt. # 201-0, p. 12.

The SRO acknowledged that "[a] student's progress under a prior IEP is a relevant area of inquiry for purposes of determining whether an IEP has been appropriately developed, particularly if the parents express concern with respect to the student's rate of progress."  Dkt #20-2, p. 13 (citing cases).  The SRO observed that R.N. was "diagnostically complex," exhibiting symptoms of auditory processing disorder during one test and in the same year, testing within an "average range" for auditory processing skills and listening comprehension.  Dkt. #20-2, p. 14.

Regarding R.N.'s past progress, the SRO noted the following:  R.N. "showed differing levels of competence on measures of similar skills," as well as "marked variations within a single evaluation" (Dkt.# 20-2, p. 14);[6] R.N also exhibited "instability and variability" in his daily academic functioning, as evidenced by "a pattern of regression when instruction in one skill shifted to another 'higher level' skill" (Dkt. #20-1, pp. 14-15); nonetheless, R.N. showed improvement across time and task on standardized measures of reading comprehension completed over January, May, and August 2012 (Dkt. #20-2, p. 15); and the record had limited evidence of R.N.'s development in math, aside from grades based on a modified curriculum, and evidence that in the 2011-12 school year, R.N. acquired multiplication skills but experienced a concurrent standstill or regression in his addition and subtraction skills (Dkt. #20-2, p. 16).  "While the hearing record shows the student's overall academic achievement in literacy and math continued to lag behind expected levels for a student his age, it also documented progress, consistent with his identification as a student with a disability, albeit somewhat less than what might have been expected in light of his other strengths," the SRO concluded.  Dkt. #20-2, p. 17.

The SRO found that the January 2013 IEP was an "appropriate program to meet the student's needs arising from his disability," thereby reversing the IHO's determination that the IEP failed to offer the student a FAPE.  Dkt. #201-2, p. 23.  In so doing, the SRO found that:  "the student has had varying degrees of success in Sonday, with some progress and some regression" (Dkt. #20-2, p. 19); the student felt he was

---

[6] Of note, the SRO focused his decision on standardized testing measures as "the more reliable assessment of student performance and progress" compared with curriculum-based monitoring tools.  Dkt. #20-2, p. 14 n.16.

learning when he received instruction from Mrs. Moebius, the reading consultant, suggesting that "continuance of Sonday services for the remainder of the school year was reasonably calculated to allow the student to receive educational benefits" (Dkt. #20-2, pp. 19-20); given the similarities between RAVE-O and Sonday, the hearing record did not support the IHO's determination that the student would have been confused (Dkt. #20-2, pp. 20-21); the CSE added 1:1 math into the January 25, 2013 IEP, as testified to by A.N. and confirmed by the February 2013 Prior Written Notice (Dkt. #20-2, p. 21); regarding assistive technology, "the parents [did] not point to any particular device or technology that is missing from the January 2013 IEP" (Dkt. #20-2, p. 21); "the hearing record does not support a conclusion that the district's failure to force the student to use assistive technology devices available to him restricted the student's access to his educational program" (Dkt #20-2, p. 22); and "the district made reasonable attempts to address the student's anxieties relating to his placement in a special class and his embarrassment at being different from his peers" (Dkt. #20-1, p. 23).

The SRO also found that R.N. was appropriately grouped with the other students in the 12:1:1 class, and that "the district took steps to address [R.N's] feelings of being excluded from his former peer group] by providing counseling and making certain accommodations to permit the student to . . . avoid contact with his former friends." Dkt. #20-2, pp. 24-25.

Having determined that the District offered R.N. a FAPE for the 2012-13 school year, the IHO did not reach the issues of whether R.N.'s unilateral placement at the Gow School was appropriate or whether equitable considerations supported the Parents' request for reimbursement.  Dkt. #20-2, p. 25.

**The Litigation**

Plaintiffs commenced this action on March 27, 2014, seeking judgment that the District failed to provide R.N. with a FAPE in violation of the IDEA, tuition reimbursement, and costs and attorneys' fees.  Dkt. #1.  Defendant filed a motion for summary judgment on December 22, 2014 (Dkt. #20), and plaintiffs cross-moved on April 6, 2015 (Dkt. #29).  The undersigned heard oral argument on May 14, 2015. Dkt. #32.

## DISCUSSION AND ANALYSIS

**Was R.N. Denied A FAPE?**

In this case, the IHO and an SRO reached different conclusions about whether the District provided R.N. with a FAPE.  In such circumstances, district courts generally defer to the final administrative decision rendered, that is, that of the SRO. *R.E.*, 694 F.3d at 189.  However, such deference is not absolute.  To warrant deference, an SRO's factual finding must be persuasive, well-reasoned, and supported by the record. *M.H.*, 685 F.3d at 241, 244 (recognizing that "the persuasiveness of a particular administrative finding, or lack thereof, is likely to tell the tale").  The Second Circuit has held that:

> when . . . the district court appropriately concludes that the SRO's
> determinations are insufficiently reasoned to merit that deference, and in
> particular where the SRO rejects a more thorough and carefully
> considered decision of an IHO, it is entirely appropriate for the court,
> having in its turn found the SRO's conclusions unpersuasive even after
> appropriate deference is paid, to consider the IHO's analysis, which is also
> informed by greater educational expertise than that of judges, rather than
> to rely exclusively on its own less informed educational judgment.

*M.H.*, 685 F.3d at 246.  Put another way, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189.

This Court finds that the SRO's decision, while having the appearance of being thorough, is not supported by the record, is insufficiently reasoned, and at times, impermissibly shifts the legal burden of proof onto the Parents.  For the following reasons, this Court concludes that the IHO's decision which is well-supported by the record, is more persuasive.

**Past Progress**

"Although past progress is not dispositive, it does 'strongly suggest that an IEP modeled on a prior one that generated some progress was 'reasonably calculated to continue that trend.'"  *S.H. ex rel. W.H. v. Eastchester Union Free Sch. Dist.*, No. 10 CV 03927 KMW, 2011 WL 6108523, at *10 (S.D.N.Y. Dec. 8, 2011) (quoting *Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1153 (10th Cir. 2008)).  On the other hand, if a student has failed to make any progress under an IEP in one year, a court "would be hard pressed to understand how the subsequent

year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995), *amended* (Oct. 24, 1995).

As the SRO noted, "[a] student's progress under a past IEP is a relevant area of inquiry for purposes of determining whether an IEP has been appropriately developed, particularly if the parents express concern with respect to a student's rate of progress." Dkt. #20-1, p. 13.  In R.N.'s case, his mother, A.N., was very vocal about her son's lack of progress, especially when the CSE recommended that he be placed in a general education classroom in the fourth grade.  Parents' Exh. M.  Of particular importance in R.N.'s case is the continuation of the Sonday reading program, which the District started using with R.N. when he was in the second grade.

Regarding R.N.'s past progress, the SRO relied on various 2012 reports – authored by Dr. Nocera in February 2012 (Dist. Exh. 45), Dr. Schworm in May 2012 (Dist. Exh. 44), and Diane Wojnowski of Buffalo Hearing and Speech in August 2012 (Dist Exh. 42) – to conclude that R.N. had progressed in reading.  Dkt. #20-2, p. 15.  While these reports might suggest minimal growth in the singular skill of reading comprehension, they overall demonstrate that R.N. was reading at a second or third grade level on every other measurable skill, lagging approximately three to four grade levels behind his sixth grade peers.

For example, Dr. Nocera's concluded that in early 2012, R.N.'s independent reading level was a 2.3 grade equivalency on the Woodcock Johnson and on the Gray Oral Reading Test – IV, his reading rate was 2.7, his accuracy was 3.4, and his fluency was 3.0. Dist. Exh. 45, p. 10. In closing his report, Dr. Nocera wrote:

> R.N.'s achievement scores have fallen from those in past evaluations. This indicates that while he may be making some gains, he is falling further behind his classmates. [R.N.]'s reading comprehension is in the low range. He is not reading fluently or with automaticity, though he may demonstrate comprehension that he gains from context. . . The following components are essential for teaching children to read: phonemic awareness, phonics, vocabulary development, reading fluency, and reading comprehension. [R.N.] demonstrated skills with the phonemic awareness tasks of blending and identifying incomplete words. His phonics knowledge is lacking as evidenced by his difficulty with tasks such as letter/word reading and word attack. His fluency suffers because his decoding skills are weak. This also impairs his comprehension, as he is using all of his resources to decode, and cannot then focus on attaching meaning to what he has read. . . . Based on these findings, [R.N.] is demonstrating a failure to develop reading skills.

Dist. Exh. 45, p. 11.

As previously noted, Dr. Schworm reported in May 2012 that on the Woodcock Reading Mastery Test – Revised, R.N.'s scores placed him at a 2.6 grade equivalent for Word Identification, a 2.4 grade equivalent for Word Attack, and a 3.4 grade equivalent for Reading Comprehension. Dist. Exh. 44, pp. 5-6. On the Test of Written Spelling – 4 and the Kaufman Spelling Test, R.N. scored at a 1.7 and a 2.6 grade equivalency, respectively. Dist. Exh. 44, p. 7. At the hearing before the IHO, Dr. Schworm explained that while reading comprehension may be a relative strength for R.N., he relied very heavily on context because of his weakness in other fundamental areas of reading. Tr. at 652. "You've got to remember," Dr. Schworm cautioned during

his testimony, "only poor readers use context."  Tr. at 652.  Finally, the Buffalo Hearing

and Speech report from August 2012 indicated that R.N.'s overall oral reading skills,

reading rate, and accuracy were all "severely delayed."  Dist. Exh. 42, p. 4.


Other reports, not cited to by the SRO, demonstrate regression in certain

areas of reading.  For example, Dr. Russin, the District Psychologist, reported a drop in

R.N.'s passage comprehension from a 2.1 grade equivalency in 2009 to 1.5 in 2011,

and a corresponding drop in spelling from 2.6 grade equivalency in 2009 to 2.5 in 2011.

Dist. Exh. 46, p. 2.  Dr. Russin opined:

> [R.N.] continues to demonstrate difficulties in the areas of reading and
> math.  He has displayed some growth since his previous assessment in
> 2009, although he still remains at approximately a mid[-]second to third
> grade reading level across decoding, fluency and comprehension.

Dist. Exh. 46, pp. 2-3.


With respect to R.N.'s prior progress in math, the SRO acknowledged that

there was "limited evidence regarding the student's development in math, aside from his

grades on a modified curriculum."  Dkt. #20-2, p. 16.  The SRO noted that R.N.'s

acquisition of multiplication and division skills was accompanied by a standstill or

regression in addition and subtraction skills (Dkt. #20-2, p. 16), and that R.N. had a

tendency to regress and lose previously-mastered skills as evidenced by the fact that

two of R.N.'s seventh grade goals were to tell time and make change (Dkt. #20-2, p. 15

n.17).  Nonetheless, the SRO concluded that "on balance, the evidence does not

support the conclusion that the student failed to progress."  Dkt. #20-2, p. 17.

This Court finds that the reports cited to by the SRO actually contradict, rather than support, his conclusion that R.N. made progress in the area of reading prior to the 2012-13 school year. Moreover, given the SRO's explicit finding that there was no evidence that R.N. had progressed in math, it was erroneous for him to conclude that the District had somehow met its burden to show that he had. Rather, the overwhelming evidence in the record supports the IHO's findings that:

> There did not seem to be any dispute about the student's minimal progress in reading during the school years leading up to the 2012-13 school year. Nor did there seem to be any dispute about the fact that the Student did not make much progress in mathematics during those school years.

Dkt. #30-1, p. 12. R.N.'s past progress is deficient even in light of the serious limitations imposed by his Dyslexia. As the SRO acknowledged, at least one of R.N.'s evaluators, Dr. Nocera, testified that he would have expected more progress from R.N. between 2007 and 2013, given R.N.'s cognitive ability to learn and acquire information. Dkt. #20-2, p. 17; Tr. at 910. Dr. Schworm testified that R.N. was able to reason and was of average intellect (Tr. at 669-70), and Dr. Renick stated that R.N.'s verbal comprehension score, which was within normal range, was the significant indicator of his cognitive ability (Tr. at 1084-85), suggesting that R.N. was capable of making educational progress under the right program. This is especially true given R.N.'s "willingness to work hard" even at things he was not good at, like reading. Parent's Exh. P (July 17, 2012 email from Mrs. Moebius to Mrs. Kendall-Jakus stating that she was "very encouraged by [R.N.'s] willingness to work hard"); Dist. Exh. 47, p. 3 (2007 report from Dr. Jackson describing R.N. as "a cute and cooperative little boy who worked diligently throughout testing and clearly aimed to please the examiners").

Plaintiffs contend that the SRO improperly rejected Dr. Schworm's February 2013 evaluation and Dr. Nocera's March 2013 evaluation, both of which revealed through standardized testing that R.N. had not progressed in reading or math since 2012. Parents' Exh. D & E. In determining whether an IEP was appropriate, "the IEP must be evaluated prospectively as of the time of its drafting," and "both parties are limited to discussing the placement and services specified in the written plan and therefore known to the parties at the time of the placement decision." *R.E.,* 694 F.3d at 186-87. "[A] deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." *R.E.,* 694 F.3d at 185. "And the converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE." *D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 361 (S.D.N.Y. 2013).

Under the circumstances, the SRO properly precluded Dr. Schworm's and Dr. Nocera's reports evidencing R.N.'s lack of progress. This Court agrees with the IHO that it was reasonable for R.N.'s Parents to have him retested using standardized measures after being presented with Dr. Kilanowski-Press' optimistic, curriculum-based report regarding R.N.'s reading progress at the January 2013 CSE meeting. Dkt. #30-1, p. 35. Nonetheless, Dr. Nocera's and Dr. Schworm's reports, which appear to rebut the District's claims of R.N.'s progress, were not before the CSE when it created R.N.'s January 25, 2013 IEP. Therefore, they should not have been considered by the IHO in deciding whether that IEP was reasonably calculated to enable R.N. to receive

educational benefits.  In the final analysis, however, the IHO's reliance on Dr. Schworm's and Dr. Nocera's reports was harmless.  Even excluding the February and March 2013 standardized tests, the preponderance of the evidence still shows that R.N. made only trivial progress in the areas of reading and math leading up to the January 2013 CSE meeting.

The SRO's decision is unpersuasive for another reason:  he rejected the legitimacy of curriculum-based measures in favor of standardized testing, and then concluded that R.N. made progress even though there was no standardized testing to confirm such progress.  Dkt. #20-2, p. 14 n.16.  Early in his decision, the SRO explicitly stated that while curriculum-based monitoring tools "can provide the student's teachers with information  . . . [for] daily instruction," his decision would focus on standardized testing measures, which he described as "the more reliable assessment of student performance and progress."  Dkt. #20-2, p. 14 n.16.  The primary evidence relied upon by the District in support of its position that R.N. was progressing under the November 2012 IEP were R.N.'s grades, the AIMSweb data, and Dr. Kilanowski-Press' January 2013 report based on that data.  The last standardized test given to R.N. (with the exception of the excluded 2013 reports) was by Diane Wojnowski of Buffalo Hearing and Speech in August 2012.  Dist Exh. 42.  Thus, there was no proof in the form of standardized test scores that R.N. had made any progress during the 2012-13 academic year.

Regarding the other non-standardized evidence proffered by the District, this Court agrees with the IHO that it was insufficient to show past progress. The record reveals that R.N.'s grades were based on a "highly modified" curriculum.[7] As a matter of law, good grades in a modified curriculum do not equate to educational progress. *Nein v. Greater Clark County Sch. Corp.*, 95 F. Supp. 2d 961, 977-78 (S.D. Ind. April 17, 2000). The subjective nature of R.N.'s grades was further supported by testimony from A.N. that prior to being placed back in a 12:1:1 classroom in the middle of his sixth grade year, R.N.'s grades were being "inflated," that is, he was getting excellent scores at school despite the fact that he did not understand his homework. Tr. at 976, 980.

Dr. Kilanowski-Press' January 22, 2013 report that R.N.'s reading had improved under the Sonday system was exclusively predicated on curriculum-based measures (AIMSweb and Maze data) that the SRO found to be less reliable measures of student progress. Dist. Exh. 36. It is undisputed that Dr. Kilanowski-Press had never evaluated, observed, or even met R.N. Dkt #31-2, ¶¶ 93-94. At the hearing, Dr. Kilanowski-Press candidly testified that she had not reviewed anything but the AIMSweb and MAZE data, both curriculum-based measures, in rendering her reports. Tr. at 331 ("I did not have anything to do with the second CSE meeting besides . . . reviewing the progress monitoring and writing the report"). Dr. Kilanowski-Press repeatedly qualified her projection that R.N. would be reading on a fifth grade level by the end of the 2012-13 academic year, stating that it would happen "if [R.N.] were to

---

[7] The District argues that the IHO erred in finding that R.N.'s curriculum was modified. However, Mrs. Merewether, R.N.'s special education teacher who graded him, explicitly testified that R.N.'s curriculum was "highly modified" from that of a seventh grade general education student and that R.N.'s grades reflected how he performed in a modified curriculum.

keep it up" or "should [R.N.] continue along the same trajectory," Tr. at 264, 265, and cautioned that "there is no guarantee about anything."  Tr. at 263.

The likelihood that R.N. would progress to a fifth grade reading level within five months was undermined by the fact that Mrs. Moebius – the person to whom R.N. attributed his progress in reading – had scaled back on instructing R.N. from four times per six-day cycle during the Summer to two times per six-day cycle during the school year.  Tr. at 71-72, 84, 96-97, 432-33, 779-80.  Further undercutting Dr. Kilanowski-Press' optimistic assessment is R.N.'s precipitous drop in his rate of reading improvement (compare his average rate of improvement of 5.5 words correct per week between November 27, 2012, and December 6, 2012, to .60 words correct per week between November 27, 2012, and January 15, 2013).  Although Dr. Kilanowski-Press attributed this drop to R.N. having switched to fourth grade progress monitoring, the IHO noted that R.N.'s initial rate of improvement on this more challenging material was much higher than it was seven weeks later. Dkt. #30-1, p. 15.  The IHO noted that although R.N had achieved a level nine in Sonday 2 by October 11, 2012, he was still on that level in January 2013, suggesting that R.N. had stagnated in his reading.  Dkt. #30-1. Because there was no mastery check between July 12, 2012, and October 11, 2012, the IHO was unable to determine if R.N.'s purported progress had been made during the Summer (when he was instructed in Sonday exclusively by Mrs. Moebius) or during the Fall (when he got only 50% of his reading instruction from Mrs. Moebius).  This was directly relevant to what R.N.'s expected rate of progress would be for the remainder of the 2012-13 school year.

Based on the foregoing, this Court finds that even giving proper deference, the SRO's conclusion that R.N. made more than trivial progress in the District prior to January 2013 was not well-reasoned or supported by the record. Under the circumstances, this Court finds that the analysis of the IHO, who also possesses educational expertise, was better reasoned and supported with respect to R.N.'s past progress.[8] *M.H.*, 685 F.3d at 246; *R.E.*, 694 F.3d at 189.

### The January 25, 2013 IEP

Having found that R.N. did not progress under his prior IEPs, this Court must now consider whether the January 2013 IEP was reasonably calculated to produce progress, rather than regression. The January IEP recommended the same basic programming with placement in the 12:1:1 classroom and some changes to R.N.'s reading instruction and math intervention. Of particular interest are the continued use of the Sonday reading program, which the District used to instruct R.N. since his second grade year, although at a less frequent rate, and the addition of the separate reading program, RAVE-O. Having reviewed the record in its entirety, this Court finds that the CSE's recommendations for R.N.'s literacy instruction were inappropriate and the SRO's conclusion to the contrary was unpersuasive.

---

[8] The District contends that the IHO employed an erroneous standard by analyzing whether R.N. made "meaningful progress" under the District's program. The Second Circuit Court of Appeals has itself used or cited this standard in numerous decisions. *M.H. v. Monroe-Woodbury Cent. Sch. Dist.*, 296 F. App'x 126, 128 (2d Cir. 2008) ("the IDEA requires that the educational plan be reasonably calculated to enable the child to receive 'meaningful' educational benefits"); *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997) ("we believe the district court properly held that M.M.'s placement at Devereux was necessary for her to make meaningful progress"); *Walczak*, 142 F.3d at 132 ("the objective evidence in this case demonstrates that B.W. could make meaningful academic and social progress in a day program"). Moreover, this Court finds that in substance, the IHO employed a standard consistent with the prevailing standard, "likely to produce progress and not regression," and affording an "opportunity greater than mere trivial advancement." *T.P.*, 554 F.3d at 254; *Cerra*, 427 F.3d at 195.

Regarding Sonday, the record shows that in May 2012, Dr. Schworm recommended that the district consider other reading programs.  Dist. Exh. 44, p. 11.  In November of that same year, Dr. Kilanowski-Press herself "strongly suggested" that the District completely replace Sonday with RAVE-O.  Dist. Exh. 23, p. 2; Tr. at 100-101; Dkt. #29-5, ¶ 24.  But she thereafter reported in January 2013 that R.N. was making excellent progress using Sonday and would be reading on a fifth grade level by the end of his seventh grade year.  Dist. Exh. 36.  Not only did the SRO fail to reconcile Dr. Kilanowski-Press' fundamentally inconsistent positions (that R.N. was succeeding under Sonday, but that the program should be completely replaced), he endorsed the CSE's recommendation that Sonday should be decreased and RAVE-O should be added to supplement (rather than to replace) R.N.'s reading instruction.  This apparent compromise was not supported by any of the expert testimony in the record.

To the contrary, there were only two logical conclusions to be drawn from the expert testimony presented at the hearing before the IHO:  either that R.N. was making progress under Sonday and the program should be continued at its prior frequency; or he was not, in which case, Sonday should have been replaced in its entirety by another program.  As the IHO properly noted, since R.N. was not making progress with four 50-minute sessions of Sonday per week, reducing the services to three sessions per week would not have enabled R.N. to make progress with the program.  Dkt #30-1, p. 20.  This is especially true given that Mrs. Moebius, the reading specialist, was not always available to teach R.N.  Tr. at 779.  Under the reduced schedule, it was very possible that less than half of R.N.'s Sonday instruction would be

administered by Mrs. Moebius as opposed to Mrs. Bittner who was less qualified in Sonday instruction.

Regarding RAVE-O, the IHO appropriately found that the District only described it in generalities (Dkt. #30-1, p. 21), confirming only that the name RAVE-O was an acronym for "retrieval, automaticity, vocabulary and orthography" (Tr. at 115-16), that the program was "more visual" than Sonday (Tr. at 443), and that it would "possibly benefit" R.N. in the area of "automaticity/rate of information retrieval."  Dist. Exh. 23, p. 2.  Beyond that, Dr. Kilanowski-Press was "silent as to the appropriate level (duration and frequency) of [RAVE-O] instruction."  Dkt. #30-1, p. 21.  The IHO noted that as between Dr. Kilanowski-Press and Dr. Schworm, Dr. Schworm had more familiarity with both R.N. and the RAVE-O program.  Dkt. #30-1, p. 22.  Dr. Schworm testified that one would use either RAVE-O or Sonday to instruct R.N., but that using both together (along with a third program used in his classroom LEAD21), would likely confuse him.  Dkt. #30-1, p. 22.  Dr. Schworm's opinion, as well as R.N.'s documented difficulty in retaining skills and need for structure and repetition, the IHO reasoned, weighed against reducing Sonday instruction and introducing a second reading program with its own structure.  Dkt. #30-1, p. 21.

In reaching the opposite conclusion, the SRO cited to Dr. Kilanowski-Press' testimony that combining Sonday and RAVE-O was "not going to hurt" R.N.  Dkt. #20-2, p. 20; Tr. at 276.  While that might be the case, the purpose of the IEP was to provide R.N. with an opportunity to progress academically, not simply to avoid "hurting"

49

him academically.  Under the circumstances, the IHO's determination that Dr. Schworm was more credible (because of his expertise and familiarity with R.N.) was established by the record and should not have been disturbed.  *See, e.g., Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 528–29 (3d Cir. 1995), amended (Oct. 24, 1995) (holding that "credibility-based findings deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion").

Regarding the math component, the January 2013 IEP did not add any special education services.  The district argues that the IHO erroneously excluded the February 2013 Prior Written Notice that R.N. would get 1:1 Academic Intervention Services targeting math.  This Court agrees with the SRO that the Prior Written Notice was not retrospective testimony in that it did not materially alter what was set forth in the IEP.  *R.E.*, 694 F.3d at 186.  Rather, it clarified that R.N. would get Academic Intervention Math Services in the 1:1 format as was discussed at the January 2013 CSE Meeting.  Tr. at 1169.

That said, this Court finds that the IHO's exclusion of the Prior Written Notice of 1:1 Academic Intervention Services for math was harmless.  According to R.N.'s January 2013 IEP, R.N. had been receiving Academic Intervention Math Services two to three times in a six-day cycle for 30 minutes in the Fall of 2012.  Dist. Exh. 7, p. 7.  Mrs. Merewether testified that R.N. received this math instruction 1:1.  Tr. at 422.  Despite this targeted instruction, R.N. regressed in his lower math skills.  R.N.'s

math regression is evidenced by his annual goals in the January 2013 IEP, which involved one-step addition and subtraction; telling time to the minute, quarter hour, and half hour; and making change up to a dollar, all fundamental skills that are typically mastered in elementary school.  Dist. Exh. 7, p. 10.  Thus, even if the IHO considered that R.N.'s Academic Intervention Services for math services would be provided 1:1 under the January 2013 IEP, exactly as they had been, there was no evidence that this would produce anything other than regression, exactly as it had.  This is especially true given Mrs. Kendall-Jakus' testimony that Academic Intervention Services are not mandated in the IEP like Special Education Services are, but rather, are up to the discretion of the teacher.  Tr. at 746-48.

        The SRO also made fundamental errors in analyzing whether the District was meeting R.N.'s needs for assistive technology and counseling.  Regarding assistive technology, the SRO erroneously shifted the burden onto the Parents to show that the resources provided to R.N. by the District were inadequate.  Dkt. #20-2, p. 21 ("The Parents do not point to any particular device or service that is missing from the student's January 2013 IEP").  The record shows that:  the January 2013 IEP did not incorporate any of the assistive technology recommendations made by the University at Buffalo Center for Assistive Technology (Dist. Exh. 41, p. 6; Dist. Exh. 7, pp. 13-14); R.N. did not know how to use the technology provided to him (Tr. at 1200, 1130); and R.N.'s teacher had not been trained on how to use the laptop, text-to-speech software, or the audio versions of the textbooks (Tr. at 419).

With respect to R.N.'s anxiety, the SRO concluded that the January IEP was sufficient to meet R.N.'s needs as evidenced by Mrs. Stevens' testimony that R.N. was progressing in the "social emotional area," "including how he was handling stress." Dkt. #20-2, p. 22. This ignores the fundamental fact that Mrs. Stevens was a private counselor whose services R.N.'s Parents had to pay for themselves. Thus, these services and the benefits R.N. got from them are not part and parcel of the FAPE the district was legally obligated to provide. Mrs. Kendall-Jakus herself testified that anxiety was one of R.N.'s "greatest issues." Tr. at 136. R.N.'s anxiety about his placement adversely affected his learning in that it made it very difficult for him to focus on his academics. Tr. at 930-31, 986-93. Apparently unable to meet R.N.'s emotional needs, the District referred R.N. to Mrs. Stevens for private counseling. Tr. at 400, 917. The only conclusion to be drawn from these facts is that the counseling services and other accommodations offered by the District were inadequate. *See, generally, Naugatuck Board of Educ. v. Mrs. D.*, 10 F. Supp. 2d 170, 180-81 (D. Conn. 1998) (holding that the failure to address a student's emotional problems that interfere with his ability to learn may render an IEP inadequate as a matter of law).

This Court finds that the District met its burden to show that R.N.'s placement was appropriate in that R.N. was similar to his 12:1:1 peers in terms of IQ and reading comprehension. That R.N. was the lowest functioning student in the class in terms of math skills or that some of the students exhibited disruptive behaviors is not fatal to the SRO's finding that R.N.'s placement was appropriate. R.N.'s issues with his placement in the 12:1:1 began when he was pulled out of the general education

classroom mid-year in the sixth grade and separated from his friends.  By all accounts, this was extremely upsetting for R.N.  At this juncture, it is impossible to determine if R.N.'s anxiety could have been avoided by keeping him in special education classroom in elementary school (rather than mainstreaming him over the objections of his mother). However, R.N.'s disappointment at not being able to perform in the general education classroom in middle school does not render his placement in the 12:1:1 classroom inappropriate.  This Court finds that the SRO correctly concluded at that point in R.N.'s academic development, he was appropriately placed in a 12:1:1 classroom.

On balance, however, the propriety of R.N.'s placement does not overcome the deficiencies in the District's literacy and math instruction, counseling, and assistive technology.  This Court finds based on a preponderance of the evidence that the January 2013 IEP, which was very similar to prior IEPs under which R.N. failed to progress, was not "reasonably calculated to enable [him] to receive educational benefits."  *Lillbask*, 397 F.3d 77, 83 n.3

**Unilateral Placement at the Gow School**

The SRO did not reach the question of whether the Gow School was an appropriate private placement for R.N.  That being the case, this Court may defer to the IHO's conclusions regarding placement, provided that her decision is well-reasoned and supported by the evidence.  *M.H.*, 685 F.3d at 252.  This Court finds, consistent with the IHO's decision, that the Parents met their burden to show by a preponderance of the evidence that the Gow School's "educational instruction [is] specifically designed to

meet the unique needs of the student." *Gagliardo*, 489 F.3d at 112.  It is important to note that parents seeking reimbursement need not show that a private placement meets "the IDEA definition of a free appropriate public education." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (citing 20 U.S.C. § 1401(9)).  Rather, "the test for the parents' private placement is that it is appropriate, and not that it is perfect." *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999).

As the IHO noted, the Gow School teaches children like R.N. with Dyslexia and difficulty in math, offers small classes six days a week with some 1:1 instruction, and offers a multi-sensory, phonics based Reconstructive Language program that is effective for Dyslexia, a Constructive Writing composition class, daily study hall, and tutoring.  Dkt. #30-1, p. 28-29.  The fact that R.N. had a lower IQ than the average student at Gow did not render his placement there inappropriate given the Gow School's explanation that R.N.'s verbal comprehension score, which was within normal range, was the more relevant measure of his ability to learn.  Tr. at 1084-85. This conclusion was confirmed by the testimony of Dr. Nocera, who testified that "R.N. is able to listen to directions and listen to material, understand it, follow the directions correctly within the average range for his age and grade," and "has the intellectual ability to learn and acquire new information."  Tr. at 832-33.

Finally, this Court rejects the District's argument that the Gow School was too restrictive because all of the students there have learning disabilities.  As the IHO correctly noted, "unilateral placements are not subject to the same mainstreaming

requirements as school district placements."  Dkt. #30-1, p. 31 (citing *Frank G.*, 459 F.3d at 364).  The record in this case shows that R.N.'s interactions with the general education students at the District were very stressful for him and he went to great lengths to avoid seeing them at school.  R.N. was particularly concerned about being seen by his general education friends in the special education classroom or in the company of his special education classmates.  As the IHO noted, "the District had to implement multiple accommodations to address [R.N.'s] anxiety issues at school," such as releasing him from his classes early so he would not be seen leaving the special education classroom and moving him away from the door of the classroom so he would not be seen by the general education students. Dkt. #30-1, p. 31.  "[R.N.] was not benefiting from his exposure to students in the general education setting [at the District]," the IHO observed.  Dkt. #30-1, p. 31.  "To the contrary, [this exposure] was increasing his anxiety level and resulting in increasing social isolation."  Dkt. #30-1, p. 31.  While it might not be true of all special education students, this Court agrees with the IHO that R.N. "appeared to benefit by being in a school in which all of the other students has similar special education needs."  Dkt. #30-1, p. 31.

**Equitable Factors**

This Court also finds that equitable factors weigh in favor of reimbursement for the Parents, an issue that was also not ruled upon by the SRO.  The record reflects that the Parents, particularly A.N., actively engaged with the District for many years in evaluating R.N. and developing his IEP.  She participated in the CSE meetings and shared her concerns with the District about R.N.'s placement.  Dist.

Exh. 22, p. 2; Dist. Exh. 49, p. 2.  The fact that the Parents decided to send R.N. to the

Gow School in advance of the January 2013 meeting does not undermine the

conclusion that they should be reimbursed.  On this record, it cannot be said that the

Parents' years-long cooperation with the CSE was merely a "sham" to get tuition

reimbursement.  *See, e.g., Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656,

660-61 (S.D.N.Y. 2005); *J.P. ex rel. D.P. v. N.Y.C. Dep't of Educ.*, No. CV 10-3078 ERK

MDG, 2012 WL 359977, at *14 (E.D.N.Y. Feb. 2, 2012).


        As previously noted, this Court does not find it suspicious that R.N.'s

Parents had him evaluated in 2013 by Drs. Nocera and Schworm after the District

offered Dr. Kilanowski-Press' report in January 2013 opining that R.N. was making

substantial progress in reading.  Dr. Kilanowski-Press' opinion was completely at odds

with the District's prior position that R.N.'s reading progress was poor.  Given these

inconsistencies in the reports of R.N.'s progress, it was reasonable for the Parents to

have him reevaluated using standardized measures.  This is particularly true given

A.N.'s experience that subjective reports provided by the District (such as R.N.'s scores

in fourth and fifth grade) had been "inflat[ed]."  Tr. at 980.  There being no other

meritorious objections, this Court finds that the equitable factors support reimbursement

of the tuition paid by R.N.'s Parents to the Gow School for the period from February

through June 2013.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's Motion for Summary Judgment (Dkt. #20) be DENIED and plaintiffs' Cross-Motion for Summary Judgment (Dkt. #29) be GRANTED.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.</u>

**SO ORDERED.**

**DATED:**    **Buffalo, New York**
              **November 15, 2016**

                              <u>*s/H. Kenneth Schroeder, Jr.*</u>
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**